In the Matter of DEBENHAMS, INC., Petitioner, v COMMISSIONER OF FINANCE, NEW YORK CITY, Respondent.

First Department, May 27, 1986

## APPEARANCES OF COUNSEL

*Margaret Murphy* of counsel *(Emanuel G. Demos* and *Robert M. Kelly* with her on the brief; *White & Case,* attorneys), for petitioner.

*Stanley Buchsbaum* of counsel *(Glenn Newman* with him on the brief; *Frederick A. O. Schwarz, Jr., Corporation Counsel,* attorney), for respondent.

## OPINION OF THE COURT

Sullivan, J.

In this CPLR article 78 proceeding, transferred to this court pursuant to CPLR 7804 (g), Debenhams, Inc., a Delaware corporation which sells a brand of ladies' shoes under the trade name I. Miller, seeks to review a final determination of the Commissioner of Finance, issued after a statutory hearing, assessing it $61,798.22, plus interest of $46,656.20, for delinquencies in the payment of New York City commercial rent or occupancy tax for the periods from June 1, 1976 through May 31, 1979.

Debenhams sells its shoes in numerous I. Miller retail stores which it operates throughout the country, as well as in the I. Miller shoe departments of several large department stores operated by the Bonwit Teller division of Genesco, Inc. From June 1976 through May 1979 (the audit period), Debenhams sold I. Miller shoes at a Bonwit's store located at 721 Fifth Avenue in New York City, for which it paid New York City commercial rent tax based upon an estimated rent of 8½% of net shoe sales. On April 15, 1980, the Commissioner of Finance issued a notice of determination and demand for payment of additional tax for the audit period based upon a claimed rent of 14½% of net sales, which was the total consideration Debenhams paid to Genesco for operation of the I. Miller shoe department at this particular store.

At a hearing before a hearing officer of the New York City Department of Taxation and Finance, Debenhams introduced evidence that the rent paid to Genesco during the audit period was less than 8½% of net sales and that the additional payments were to compensate Genesco for other services which it provided to Debenhams, including credit costs, interest expense, bad debt expense, personnel costs, material and supplies and accounting and auditing services. The Commissioner, relying exclusively on the presumption set forth in

Administrative Code of City of New York § L46-3.0 (a)[1] and Commercial Rent or Occupancy Tax Regulations article 8 (5), did not offer any proof to rebut or contradict this evidence.

On June 23, 1981, the Commissioner issued a final determination of tax deficiency finding that Debenhams owed additional tax for the audit period on the basis of the entire 14½%. After transfer of Debenhams' CPLR article 78 proceeding to this court, we annulled the determination and remanded the matter for reassessment, finding that "Debenhams introduced expert testimony and documentary evidence to rebut the presumption that the entire 14½% of its net sales represented taxable base rent, but the [hearing officer] appears to have disregarded this evidence upon the erroneous view that the presumption [of Administrative Code § L46-3.0 (a)] was conclusive" (92 AD2d 829, 830).

On remand, a further hearing was held at which Debenhams presented additional evidence. Again, the Commissioner failed to offer any evidence. The hearing officer denied Debenhams' petition for redetermination of the tax, finding that "[it] failed to sustain its burden of proof and [to] rebut the presumption that its entire payment of 14-1/2 percent of net sales represents taxable base rent pursuant to section L46-3.0 (a) of the Administrative Code and Article 8 (5) of the Commercial Rent Tax Regulations". On the basis of this decision, on October 11, 1984, the Commissioner issued the deficiency determination which is the subject of this proceeding.

As the evidence adduced at the hearings reflects, on May 28, 1976, Debenhams and Genesco entered into an agreement providing for the sale of I. Miller shoes at various Bonwit stores, including the 721 Fifth Avenue location. Although designated a "lease" and providing for the payment[2] of "rent", the agreement obviously contemplated more than a landlord-tenant relationship. For example, in addition to providing the traditional amenities such as heat, electric light and water,

---

1.   Administrative Code § L46-3.0 (a) provides as follows: "For the purpose of the proper administration of this title and to prevent evasion of the tax hereby imposed it shall be presumed that all premises are taxable premises and that all rent paid or required to be paid by a tenant is base rent until the contrary is established, and the burden of proving that such presumptive base rent or any portion thereof is not included in the measure of the tax imposed by this title shall be on the tenant."

2.   Actually, Debenhams made no payments to Genesco. Bonwit's collected the proceeds of all sales of shoes in the I. Miller shoe department and, after deducting its fees and certain expenses specified in the agreement, remitted the balance to Debenhams.

elevator, janitorial and cleaning services, Genesco was required to provide Debenhams with numerous other services including extending credit to Bonwit's charge card customers on shoe department sales and paying the interest costs for such transactions; absorbing bad debt losses for customers utilizing Bonwit's charge cards for shoe department sales; paying the expenses incurred in providing package wrapping service in the shoe department and providing the necessary personnel; advertising for the shoe department; providing sales checks, stationery and equipment for use by shoe department sales personnel; supervising and administering the shoe department staff; and providing local telephone service and security for the shoe department.

In actual effect, very little changed in the physical operation of the shoe departments by virtue of the lease. Bonwit's was responsible for all aspects of sales transactions, including collecting cash[3] and processing all of the credit card transactions. Its employees continued to operate the shoe departments and remained on Bonwit's payroll, receiving their W-2 statements from it and participating in its pension plan. Although the salary and benefits of these employees were deducted as expenses from the shoe department's gross sales, Genesco absorbed all other costs involved in managing these employees, such as hiring, training, supervision and personnel administration. In reality, all that Debenhams provided were the shoes that were sold.[4]

If a customer wanted to use a credit card to purchase shoes he could use only a Bonwit's charge card, to which approximately 70% of the shoe department sales were charged, or a national credit card acceptable to it. Although Debenhams offered its own I. Miller charge card in its retail stores, these could not be used at Bonwit's. Bonwit's credit manager would approve or disapprove the charged sales. Bonwit's mailed the billing statements, provided the billing and verification clerks, conducted sales audits and carried out all associated accounting. It also bore the interest costs for the working capital required to finance the shoe department's credit transactions and absorbed all the expenses and losses connected with delinquent and uncollectible accounts. Thus, Genesco absorbed

---

3. The salaries and benefits costs of cashiers was not reimbursed to Bonwit's as was the cost of sales personnel in the shoe department.

4. Debenhams customized the shoes for Bonwit's by imprinting the Bonwit Teller trade name on them.

the cost of all credit card transactions associated with the operation of the I. Miller shoe department at Bonwit's.

In return for these services and apparently for the use of the shoe department space and show windows, Debenhams paid an annual rental equal to 14½% of its net sales, which is defined as "the sales amount less sales tax, credits for returns, discount sales to employees [and] bulk sales". Debenhams, however, as already noted, paid the commercial rent tax during the audit period, not on the basis of 14½% of its net sales, but by treating 8½% of its sales as the rent.

Debenhams called five witnesses at the two hearings. Their testimony as well as the documentary evidence it offered was tendered to establish that the portion of the considerations which it paid to Genesco attributable to rent was less than 8½% of net sales, and that the remaining portion of the considerations was paid to compensate Genesco for the other services it provided. As already indicated the Commissioner did not call any witnesses. Thus, Debenhams' evidence was uncontradicted.

One witness, qualified as an expert in real estate and experienced in the leasing of departments in department stores testified that the average rent for such a leased department during the audit period was from 6 to 8% of gross sales. This witness further testified that in such arrangement the lessee customarily provides both the personnel for operation of the department and his own services such as electricity, air conditioning, maintenance and advertising. Here, Debenhams provided only the merchandise, while Genesco provided all the other services. According to this witness, it was the furnishing of these additional services which made up the difference between the customary rental percentage of 6 to 8% and the actual 14½% paid to Genesco.

Debenhams' secretary and treasurer, who was personally involved in the negotiations leading to the execution of the lease, testified that the figure of 14½% was calculated by determining the cost of the space on a flat rental basis and then adding the cost of the various non-landlord-related services which Bonwit's provided to Debenhams. Thus, he concluded, the figure of 14½% included both rent and services.

It was also shown that during the audit period Debenhams operated its own I. Miller retail shoe store at 734 Fifth Avenue, which was directly across the street from Bonwit's 721 Fifth Avenue store, that both stores sold exactly the same

quality shoes and that their operations were directly comparable. An analysis of the costs incurred by Debenhams during the audit period for operating the 734 Fifth Avenue store with respect to the same type of services provided by Genesco at Bonwit's 721 Fifth Avenue store showed that the total cost to Debenhams of providing these services was 7.7% of gross sales in 1978 and 8% in 1979. The most significant costs were those associated with handling charge card transactions,[5] which amounted to 4.8% of Debenhams' gross sales at the I. Miller 734 Fifth Avenue store in 1978 and 7.8% in 1979. Citibank, which operated the I. Miller charge account service for Debenhams, pursuant to an agreement whereby it performed all the functions performed by Bonwit's with respect to its charge accounts, charged 5.8%[6] of charged sales for 1977 and 1978 and gave notice that it was increasing its charge to 7.25% in the second half of 1979. Thus, if customers had used the I. Miller charge card at Bonwit's instead of the Bonwit's charge card, Debenhams would have incurred expenses to Citibank in the amount of 5.8% of the total of such charges.

It was also established that the average costs of credit and accounts receivable for all specialty stores in the country having sales over $5,000,000 in 1978 was 4.16% of gross sales, that the average costs of services and operations (consisting of services and operations management, security, telephones and communications, utilities, housekeeping, maintenance and repairs) was 4.37% of gross sales, and that the average costs of merchandise receipt, storage and distribution was 1.37% of gross sales. It was further shown that the services performed by Bonwit's were essentially the same type as those encompassed by these three categories of overhead. Thus, the average cost to all speciality stores in the country of the services provided by Bonwit's was 9.9% of gross sales, while the average national cost of real estate rentals was only 4.21%.

Finally, Debenhams showed that the cost incurred in 1977 by Bonwit's for the non-landlord-type services which it provided to Debenhams were as follows:

---

**5.** Besides credit costs the other costs were for cashiers and wrappers (1.3% in 1978 and 1.4% in 1979), maintenance (.8% and .7%), telephone (.1% and .1%), shopping bags, sales checks, stationery and forms (.2% and .3%), janitorial services (.2% and .3%), sales audit and payroll preparation (.2% and .3%) and security (.1% and .1%).

**6.** I. Miller's credit card cost as a percentage of total sales was only 4.8% because 30% of such sales were cash transactions.

| Service Provided | Percentage of Sales |
|---|---|
| Other Selling Expense | 2.90% |
| Accounting and Auditing | 1.50% |
| Credit | 2.70% |
| Bad Debt Expense | 1.10% |
| Interest Expense[7] | 1.93% |
| Total | 10.13% |

On October 5, 1984, after remand, the hearing officer rendered a decision denying Debenhams' petition for redetermination of the tax and holding that commercial rent tax was payable with respect to the entire 14½% of net sales which Debenhams had paid to Genesco. In arriving at his determination, the hearing officer concluded that Debenhams "failed to prove its actual costs for nonrent services at 721 Fifth Avenue" and, thus, did not rebut the presumption that the entire payment of 14½% of net sales represents taxable base rent. The Commissioner adopted the hearing officer's determination and issued the notice of deficiency under review.

A notice of tax deficiency will not survive judicial scrutiny unless it is based upon substantial evidence and is not legally irrational. (See, e.g., Matter of American Tel. & Tel. Co. v State Tax Commn., 61 NY2d 393, 400; Matter of Voorhees v Bates, 308 NY 184, 191; Matter of London Towncars v Michael, 86 AD2d 841.) Substantial evidence has been defined to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." (Edison Co. v Labor Bd., 305 US 197, 229; Matter of Stork Rest. v Boland, 282 NY 256, 274.) As the Court of Appeals has noted " '[T]he reviewing court should review the whole record to determine whether there is a rational basis in it for the findings of fact supporting the agency's decision' " (300 Gramatan Ave. Assoc. v State Div. of Human Rights, 45 NY2d 176, 182, quoting McCormick, Evidence § 352, at 847 [2d ed]; Matter of Reynolds v Triborough Bridge & Tunnel Auth., 276 App Div 388, 392-393; New York State Labor Relations Bd. v Shattuck Co., 260 App Div 315, 317).

In the instant case, the Commissioner's determination that none of the consideration paid by Debenhams as rent was attributable to the many nonlandlord services which Genesco provided must fall for lack of evidentiary support. All five of

---

7. Although the interest cost to carry accounts receivable is not directly identified in Bonwit's retail operating statement, it can be derived from the figures available in the record.

the witnesses, whose testimony the hearing officer accepted in his findings of fact, substantiated Debenhams' claim that the portion of the consideration paid to Genesco attributable to rent was less than 8½% of total sales. In addition to this testimony, various documents established that the rental portion of Debenhams' payment to Genesco was less than 8½%. An authoritative study by *Buildings* magazine, for example, showed that typical rent for a ladies' shoe store in the New York City market during the audit period was from 6 to 7% of sales. Another, by the National Retail Merchants Association, showed that the average cost for the non-landlord-type services which Genesco provided was 9.9%. Debenhams also produced documents showing that its cost for providing these services at its own shoe store at 534 Fifth Avenue was 7.7% in 1978 and 8% in 1979, and that Genesco's cost for providing the same services at Bonwit's was 10.13% in 1977.

Thus, under any analysis and by clear and convincing evidence, Debenhams established that less than 8½% of the consideration which it paid to Genesco was attributable to rent. In contrast, the Commissioner failed to introduce any evidence to contradict or impeach its proofs. Under these circumstances, Debenhams' evidence must be given conclusive effect. *(See, e.g., Matter of Voorhees v Bates,* 308 NY 184, *supra; Matter of Sweet v D'Elia,* 87 AD2d 634; *Matter of London Towncars v Michael,* 86 AD2d 841, *supra; Matter of Floyd v D'Elia,* 83 AD2d 851; *McKinney v Lavine,* 42 AD2d 572.)* "Where * * * the evidence of a party to the action is not contradicted by direct evidence, nor by any legitimate inferences from the evidence, and it is not opposed to the probabilities; nor, in its nature, surprising, or suspicious, there is no reason for denying to it conclusiveness." *(Hull v Littauer,* 162 NY 569, 572.)

The Commissioner argues, citing *People ex rel. Kohlman & Co. v Law* (239 NY 346), that the determination must be confirmed because Debenhams failed to prove "the exact amount of error" in his assessment of deficiency. This argument fails. In *Kohlman (supra),* the taxpayer, a seller of cotton, failed to fill in that part of the franchise tax return calling for a statement of the proportion of its sales made outside the State but confirmed or accepted within. By statute, out-of-State sales orders, if confirmed or accepted here, were considered part of the business transacted in New York and therefore taxable; otherwise they were not. At a hearing, the taxpayer showed that of the sales of goods not located in New

York about one half had their origin in orders received by its agents in other States, but still failed to state whether the orders so received were accepted or confirmed at its home office in New York. The Tax Commissioner allocated all the taxpayer's sales to New York on the theory that, irrespective of the location of the goods, all of its sales had been accepted or confirmed in this State. In rejecting the taxpayer's argument that it had shown the existence of some out-of-State orders accepted in other States, the Court of Appeals held "In the absence of evidence fixing with reasonable certainty the quantum of the error, the Board should not be required to roam about in search for information impeaching its own action." *(Supra,* at p 351.) That is not the case here.

Debenhams was required to show that of the total 14½% paid to Genesco at least 6% was for nonlandlord services. It has met that burden. The question is not whether the cost of providing these services was 6.1% or 6.2% or 6.3% but whether, based on all the evidence, their cost equalled at least 6%. If Debenhams could show that, which it did, then its return was correct as filed. Unlike the situation in *Kohlman (supra),* where there was a complete absence of proof from which the Tax Commission could make a determination regarding the amount of tax due, Debenhams has submitted uncontradicted evidence that of the 14½% paid to Genesco at least 6% was for nonlandlord services. Thus, since no more than 8½% represented actual rent, no additional tax was due and the notice of deficiency must be annulled.

Accordingly, the petition should be granted to the extent that the determination of the Commissioner of Finance, dated October 11, 1984, assessing Debenhams a tax deficiency under the New York City commercial rent tax in the principal amount of $61,798.22 plus interest of $46,656.20 for a total of $108,454.42, be annulled, on the law, without costs or disbursements.

KUPFERMAN, J. P., LYNCH, ROSENBERGER and ELLERIN, JJ., concur.

Petition granted and the determination of respondent dated October 11, 1984, unanimously annulled, on the law, without costs and without disbursements.